# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SALINI COSTRUTTORI S.P.A.,<br><br>Petitioner,<br><br>v.<br><br>KINGDOM OF MOROCCO,<br><br>Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 14-cv-2036 (TSC)

## MEMORANDUM OPINION

Petitioner, Salini Costruttori S.p.A. ("Salini"), brings this action against the Kingdom of

Morocco ("Morocco"), to enforce a 2011 arbitration award issued by the International Chamber

of Commerce ("ICC") International Court of Arbitration in Paris, France.  The two parties

executed an agreement for a construction project in Morocco, but several disputes arose out of

the agreement, after which Salini filed a Request for Arbitration against Morocco with the ICC.

The ICC decision ordered Morocco to pay Salini several sums of money, including interest and

reimbursement for various duties and taxes paid by Salini throughout the construction process.

Salini then filed a petition in Morocco's courts seeking recognition and enforcement of the

arbitration award.  The Administrative Court of Rabat entered judgment in the case, ordering the

enforcement of all of the parts of the award except for those requiring Morocco to repay Salini

for various taxes it had levied against Salini, finding that aspect of the award to be outside the

jurisdiction of the international arbitration court.  Salini appealed the portion of the judgment

involving the repayment of taxes, and the Administrative Court of Appeal of Rabat affirmed the

lower court's decision.  Salini then appealed to the Moroccan Court of Cassation, the country's

1

highest civil court; that appeal remains pending.  Morocco paid Salini the amount of the award

that the Administrative Court upheld: 167,695,954.30 MAD (Moroccan dirham).

Salini filed this Petition to Recognize, Confirm, and Enforce the arbitral award pursuant

to the Federal Arbitration Act (FAA) in order to address the difference between the amount

Morocco has already fulfilled and the total amount of the ICC award, plus accrued interest.

Chapter two of the FAA codifies the Convention on the Recognition and Enforcement of Foreign

Arbitral Awards of June 10, 1958 ("the New York Convention").  9 U.S.C. §§ 201, *et seq.*  Also

before the court is Morocco's motion to dismiss the Petition under Federal Rules of Civil

Procedure 12(b)(1)—for lack of jurisdiction, and 12(b)(6)—for failure to state a claim pursuant

to Section 207 of the FAA.[1] The FAA requires that the court not confirm the award if it "finds

one of the grounds for refusal or deferral of recognition or enforcement of the award specified in

the [New York] Convention," and Article V(1)(e) of the Convention describes as possible

grounds for denial of confirmation that "[t]he award has not yet become binding on the parties,

or has been set aside or suspended by a competent authority of the country in which, or under the

law of which, that award was made."  9 U.S.C. § 207; New York Convention art. V(1)(e), June

10, 1958, 330 U.N.T.S. 38.

For the reasons below, Salini's Petition to Recognize, Confirm, and Enforce a Final,

Binding Arbitral Award will be **GRANTED** and Morocco's Motion to Dismiss the Petition will

be **DENIED**.

---

[1] While Morocco's motion to dismiss did raise a Rule 12(b)(5) argument for failure to effectuate
proper service, Morocco conceded at oral argument that service had been perfected.
Morocco also indicated at oral argument that it does not contest subject-matter jurisdiction,
meaning that there are no outstanding jurisdictional challenges at this time by the parties.
Nonetheless, the court will later address subject-matter jurisdiction, as it is a requisite to
disposition of the case and not waivable.

## I.      BACKGROUND

On May 21, 2004, Salini entered into Agreement AH03/2004 ("Construction Agreement") with Morocco, specifically the Ministry of Equipment and Transportation, to construct a road between two Moroccan cities.  (Pet. ¶¶ 5-6).  The Construction Agreement contains an arbitration clause, which allows either party to submit a dispute to either Morocco or to an arbitral award.  (Pet. ¶ 9).  In 2008, disputes arose between the parties related to, in part, "(i) the reimbursement by Morocco of direct and indirect taxes paid by Salini to its suppliers; (ii) the termination of the Agreement and the timing thereof; and (iii) the financial consequences of the partial execution of the Agreement and its termination."  (Pet. ¶ 12).  The parties were unable to settle their dispute amicably, and Salini filed its Request for Arbitration against Morocco with the ICC on August 13, 2009.  (Pet. at ¶ 13).  The Arbitration took place in Paris, France (Pet. Ex. D at 103), and on December 5, 2011, the Arbitral tribunal rendered its Final Award.  (Pet. at ¶ 17).

In the Final Award, the Arbitral tribunal decided that:

1.  It had proper jurisdiction to rule on the dispute.

2.  Salini's attempt at terminating the agreement as of January 10, 2008, was invalid.

3.  Morocco's August 1, 2008, termination of the agreement was the proper termination date.

4.  The date of final taking over of the project was April 7, 2009.

5.  Morocco was to pay Salini, by way of the works carried out, an amount of €8,158,518.87 plus [Value Added Tax ("VAT")] at a rate of 20% for the part not financed by the European Union.

6. Morocco was to pay Salini by way of interest on the principal amount of €8,158,518.87, calculated until June 30, 2010, an amount of €1,040,000.00.

7. Morocco was to pay Salini interest on this amount of €8,130,000.00, calculated from l July 2010 at the [European Central Bank ("ECB")] rate plus 3.5 percentage points, until its complete payment.

8. The agreement contained a commitment by Morocco not to impose on Salini duties or taxes, and that in the event Morocco did impose any, it would be liable to reimburse Salini.

9. Morocco was to pay Salini, by way of reimbursement of the duties and taxes on cement, heating oil, and extractions, an amount of €5,212,183.39, plus interest at the ECB rate plus 3.5 percentage points, starting from 13 August 2009 until complete payment of the principal.

10. Morocco was to reimburse all other duties and taxes to Salini, plus interest at ECB rate plus 3.5 percentage points, starting from the day after payment by Salini of the said taxes and duties and until complete reimbursement

11. Morocco was to pay Salini €2,140,600.16 by way of changes in the quantity of certain items, plus VAT at a rate of 20%.

12. Morocco was to pay Salini interest on this amount of €2,l40,600.l6, calculated from 1 July 2010 at the ECB rate plus 3.5 percentage points, until complete payment.

13. Salini was to pay Morocco the amount of €500,000.00 for delay damages plus interest at the ECB rate plus 3.5 percentage points, starting from 18 November 2009, until complete payment of the principal.

14. Salini was to pay Morocco, for the necessity of drawing up a new contract with another company, €20,000.00.

15. Morocco was to return, within eight days, all of the bank guarantees issued on behalf of Salini, based on the contract, several of which were guaranteed by a fee of €10,000.00 per day, starting from the eighth day.

16. Morocco was to grant a release from the notice to a third party holder of June 7, 2010, for an amount of €3,379,776.30, and to reimburse to Salini the amount of 468,511.16 Moroccan Dirham, increased by interest at the rate set by the ECB plus 3.5 percentage points, starting from the payment date, until complete payment.

17. The amounts Morocco owed to Salini were to be offset by the amounts Salini owed to Morocco.

18. Each party was to bear its own costs, and to pay its own half of the ICC arbitration costs, which amount to $650,000.00.

(Pet. Ex. D. at 101-03).

On April 18, 2012, Salini petitioned the Commercial Court of Morocco to enforce the arbitration award.  ("Letter from Rachad Bouhalal, Ambassador of the Kingdom of Morocco," hereinafter "Letter," at 2, ECF No. 20).  The Commercial Court of Morocco referred the case to the Administrative Court of Rabat, which issued its judgment on March 11, 2014.  (*Id.*).  The court enforced the portion of the arbitration award dealing with unpaid project costs, but held that the portion dealing with taxes was contrary to Moroccan law and therefore invalid.  (*Id.*).  Salini appealed, and on December 22, 2014, the Administrative Appellate Court in Rabat affirmed the Administrative Court's ruling.  (*Id.*).  The appellate court cited Article V of the New

York Convention, which, in the Ambassador's words, "permits a signatory of the Convention to refuse to enforce an arbitration award that is 'not capable of settlement by arbitration under the law of that country' or if 'the recognition or enforcement of the award would be contrary to the public policy of that country'." (*Id.* (quoting New York Convention art. V(2)(a)-(b))).  On April 24, 2015, Salini filed an appeal with the Morocco Court of Cassation, the country's highest civil court.  (Mot. at 5, ECF No. 46).  Salini's appeal was still pending as of June 26, 2015.  (Mot. Ex. D).  On May 5, 2015, the Administrative Court of Rabat ruled that the portion of its decision that did not deal with the tax obligations was final, and ordered Morocco to satisfy the judgment. (*Id.*)  Morocco complied and transferred 167,695,954.30 Moroccan Dirham to the court's account for Salini to withdraw.[2]   (*Id.* at 5-6).  On September 29, 2015, Salini was paid €15,236,182.16.  (Mot. Ex. F).[3]

On December 2, 2014, just before the three-year statute of limitations under 9 U.S.C. § 207 was to expire, Salini filed a Petition to Recognize, Confirm, and Enforce a Final, Binding Foreign Arbitral Award with this court.  (Pet. at 1).  Because service has been conceded, the court will not detail the extensive procedural history resulting ultimately in effective service, except to note one important matter:  The Clerk of this court entered an entry of default against Morocco on April 23, 2015, based on Morocco's failure to timely answer the complaint that had

---

[2] On the day the money was deposited, it was the equivalent of €15,324,100 and U.S. $17,425,541. *See* http://www.xe.com/currencytables/?from=MAD&date=2015-05-06#.

[3] Based on the currency exchange rate, on September 29, 2015, 167,695,943.30 DH, the amount Morocco deposited for Salini would have been equivalent to €15,379,980,80. http://www.xe.com/currencytables/?from=MAD&date=2015-09-29# or U.S. $17,289,921.1. There is a -€143,797.66 difference between the money Morocco put in the account and the amount that Salini was paid.

not yet been properly served. [4]  (ECF No. 16 at 1).  That default judgment, improperly entered, remains standing and must be vacated.

Morocco filed its motion to dismiss the petition on January 8, 2016, asserting primarily that the remaining unpaid part of the award was "set aside by a competent authority of the country in which, or under the law of which, that award was made," and therefore confirmation of the award is improper.  (Mot. at 1 (citing New York Convention Article V(1)(e))).  Morocco also asks the court to stay ruling on the petition until after a final ruling from Morocco's Court of Cassation.

## II.   LEGAL STANDARD

### A.  Federal Rule of Civil Procedure 12(b)(1)

Morocco cites Federal Rule of Civil Procedure 12(b)(1), which authorizes dismissal of a complaint in the absence of subject-matter jurisdiction, on the first page of its Motion to Dismiss (ECF No. 46 at 1); but does not cite the rule in its Memorandum in Support, nor does it make any arguments pertaining to subject matter jurisdiction, and at oral argument, it stated that it does not contest subject matter jurisdiction.  The court has subject-matter jurisdiction pursuant to the Foreign Sovereign Immunities Act ("FSIA") exceptions, 28 U.S.C. §§ 1601-11, and thus sovereign immunity has been waived.  *See* 28 U.S.C. § 1604.  FSIA provides that district courts

---

[4] The default was based on Morocco's failure to answer the complaint by March 28, 2015, after it was improperly served on January 27, 2015.  Because service on January 27, 2015 was not in accordance with Fed. R. Civ. Proc. Rule 4(j), which requires that foreign states be served in accordance with one of the four methods identified in 28 U.S.C. § 1608, the entry of default was improper.  The four methods are listed in § 1608 in order of preference; because § 1608(a)(1) did not apply, § 1608(a)(2) service was rendered ineffective by Morocco's invocation of Article 13 of the Hague Convention, and service under § 1608(a)(3) was not properly effectuated within 30 days, Salini was required to effectuate service in accordance with § 1608(a)(4), which did not take place until October 23, 2015.  Additionally, § 1608(e) prohibits a district court from entering a default against a foreign sovereign "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court," which did not occur in this instance, also rendering the entry of default improper.

have original jurisdiction over a civil action against a foreign sovereign for any claim "with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement." 28 U.S.C. § 1330(a). Section 1605 identifies as an exception to foreign sovereign immunity "any case . . . in which the action is brought . . . to confirm an award made pursuant to [] an agreement to arbitrate, if . . . (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards." 28 U.S.C. § 1605(a)(6). The FAA states that "[a]n action or proceeding falling under the [New York] Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States . . . shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy." 9 U.S.C. § 203. *See also BCB Holdings, Ltd. v. Gov't of Belize*, 110 F. Supp. 3d 233, 241 (D.D.C. 2015), *aff'd*, 650 F. App'x 17 (D.C. Cir. 2016) ("The New York Convention is exactly the sort of treaty Congress intended to include in the arbitration exception." (quoting *Creighton Ltd. v. Gov't of the State of Qatar*, 181 F.3d 118, 121 (D.C. Cir. 1999))).

### B. Federal Rule of Civil Procedure 12(b)(6)

A Rule 12(b)(6) motion to dismiss "tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In order to survive a motion to dismiss, a complaint must contain factual allegations that are "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Additionally, the facts alleged in the complaint must "state a claim to relief that is plausible on its face." *Id.* at 570. The "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a motion to dismiss for failure to state a claim under

Rule 12(b)(6), a court must construe the complaint in the light most favorable to the plaintiffs and "must assume the truth of all well-pleaded allegations." *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004).

## III.   ANALYSIS

### A.  The New York Convention

Under the FAA, a court having jurisdiction over the enforcement of an international arbitral award "shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the [New York] Convention." 9 U.S.C. § 207.  Because "the New York Convention provides only several narrow circumstances when a court may deny confirmation of an arbitral award, confirmation proceedings are generally summary in nature." *Int'l Trading and Indus. Inv. Co. v. DynCorp Aerospace Tech.*, 763 F. Supp. 2d 12, 20 (D.D.C. 2011).  The New York Convention stipulates that a court may refuse recognition and enforcement of an award if the party requesting refusal furnishes proof to the competent authority where the recognition and enforcement is sought that the award has been "set aside by a competent authority of the country in which, or under the law of which, that award was made." New York Convention art. V(1)(e).  Morocco argues that the portion of the award that dealt with taxes was validly set aside by a competent authority, Morocco.  (Mot. at 1).

The country in which or under whose arbitral law an award was made is considered the "primary jurisdiction," and other member-countries to the New York Convention are considered "secondary jurisdictions." *BCB Holdings*, 110 F. Supp. 3d at 246; *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 364 (5th Cir. 2003) ("Under the Convention, 'the country in which, or under the [arbitration] law of which, [an] award was made' is said to have *primary* jurisdiction over the arbitration award. All other signatory States are *secondary* jurisdictions, in which parties can only contest whether that State

9

should enforce the arbitral award."). Secondary jurisdictions may refuse to enforce an award, but these decisions do not preclude other jurisdictions from enforcing it. By contrast, only a primary jurisdiction may set aside an award. Courts of primary jurisdiction are "usually the courts of the country of the arbitral situs." *Karaha Bodas Co.*, 335 F.3d at 368. The words "under the law of which" in Article V(1)(e) "refer[] to the procedural law governing the arbitration, not the substantive law governing the Agreement." *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 731 (D.C. Cir 2012).

In order for Morocco to have validly set aside the portion of the award that deals with taxes, it would need to have been a primary jurisdiction, that is, the country where the arbitration occurred or under whose law the arbitral award was made. Morocco asserts that Moroccan law governed the underlying contract as well as the entire arbitration process, stating "the Arbitral tribunal determined that its procedure in rendering the award would be governed by both the general Arbitration Rules of the ICC and the arbitral law of Morocco." (Reply at 2, 6, 7).

The Amicable Dispute Resolution portion of the Agreement provides that, after exhausting the amicable dispute resolution process, the difference shall be settled, according to the choice of the contractor:

a) under the Conciliation and Arbitration Regulations of the International Chamber of Commerce of Paris, or,

b) according to local law.

(Pet. Ex. B, ECF No. 1). Salini filed its Request for Arbitration against Morocco with the ICC in Paris on August 13, 2009. (Pet. ¶ 13). In the arbitral award, the ICC confirmed its jurisdiction over the dispute. (Pet. Ex. D. ¶ 26). The ICC also noted that it would abide by the applicable law as provided in the Construction Agreement. (*Id*. ¶ 27). The Construction

Agreement declares in relevant part that "[t]he Particular Conditions define the law governing all issues not covered by the provisions of the Agreement." (*Id.*).  The Particular Conditions specify that "[t]he Contractor is subject to the laws and regulations in effect within Morocco."  (*Id.*)  The ICC agreed to stand by the aforementioned choice of law "as well as the provisions of the Arbitration Rules of the ICC, which provide that the Arbitral tribunal shall also take account of the provisions of the agreement and the relevant trade usages."  (*Id.*).  The Arbitration Rules of the ICC provide that "[t]he proceedings before the Arbitral tribunal shall be governed by the Rules and, where the Rules are silent, by any rules which the parties or, failing them, the Arbitral tribunal may settle on, whether or not reference is thereby made to the rules of procedure of a national law to be applied to the arbitration."  ICC Rules of Arbitration art. 19.

Because Salini chose subpart (a), selecting the rules of arbitration of the ICC to govern the non-amicable dispute resolution, the procedural law governing the arbitration was the ICC Arbitration Rules.  Considering Morocco presented no argument or evidence that it has adopted the ICC arbitration rules as its own rules of arbitration, the procedural law that governed the arbitration was not Moroccan procedural law; and France remains the jurisdiction where the arbitration physically took place.  Morocco cannot therefore claim to be a primary jurisdiction based on the "under the law of which" clause of Article V.  The D.C. Circuit has stated that "[t]he Convention does not endorse a regime in which secondary States (in determining whether to enforce an award) routinely second-guess the judgment of a court in a primary State." *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 937 (D.C. Cir. 2007) (addressing an award that was set aside by a primary jurisdiction).

While Morocco argues that the contract contained a catch-all provision leaving any matter not specifically addressed to be governed by Moroccan law, neither party attached as an

exhibit an English translation of the entire contract.[5]  The record contains only an English

translation of the "Dispute Resolution" section quoted above, and the parties' and arbitral

tribunal's descriptions of and references to the contract language.  The tribunal's Award states:

> 27. The parties agreed on the law applicable to the Agreement. Article 2.1 of the General
> Conditions (S9) declares: *"The Particular Conditions define the law governing all issues
> not covered by the provisions of the Agreement."* Article 2.1 of the Particular Conditions
> (S7) specifies that *"The contractor is subject to the laws and regulations in effect within
> Morocco."*
> The Arbitral tribunal shall stand by this choice, as well as the provisions of the
> Arbitration Rules of the ICC, which provide that the Arbitral tribunal shall also take
> account of the provisions of the agreement and the relevant trade usages.

(Pet. Ex. D. ¶ 25).  Moreover, Morocco has been unable to point to any example of a

Moroccan procedural or arbitral rule or law that was used by the tribunal in reaching its Award

decision.[6]  It has not even identified any Moroccan procedural rule that it believes *should* have

been used by the tribunal.  Because: (1) the procedural law governing the arbitration was covered

in the Agreement, rendering the catch-all language inapplicable; (2) Morocco has not identified

any procedural law that was or could have been used to fill in any gaps; and (3) the "particular

conditions" language refers to the substantive law governing the contract, which was

undoubtedly Moroccan law; the court finds that Moroccan procedural law did not govern the

arbitration and Morocco therefore was not a primary jurisdiction empowered to set aside the

award.

---

[5] Although Morocco finds it "curious" that Salini did not attach a translation of the entire
agreement to its enforcement petition, (Mot. at 2 n.1), the court notes that Morocco also could
have attached a translation to its Motion and did not.

[6] Morocco points to an example of Moroccan law in the Award, but the example—the Moroccan
Civil Code's remedy offsetting provision, is substantive—and not procedural or arbitral—law.
(Pet. Ex. D. ¶ 221).

There is no evidence that the ICC in Paris, or another competent court in France, set aside the arbitral award.  Thus, this court need not and should not take into consideration whether or not a secondary court, such as the Administrative Court of Rabat, set aside or declined to enforce a portion of the award.  The language in Article V(1)(e) of the New York Convention, as understood by the D.C. Circuit, and as applied to the facts of this case, vests the courts of France, and not Morocco, with the authority to set aside the arbitral award.

Additionally, although Morocco attempts at this stage to characterize the actions of its courts as assessing the validity of the arbitral award as a primary jurisdiction, a close read of the courts' decisions indicates that the Moroccan courts were in fact acting as the courts of a secondary jurisdiction.  The appellate court referred to the lower administrative court's action as "enforcement of the arbitration award" and "rejection of the part pertaining to taxes and duties." (Ministry of Justice and Freedoms Administrative Court of Appeal in Rabat, Judgment N. 6321 (trans.) ECF No. 20 ex. B at 2).  It also referenced New York Convention article V, stating, "on the one hand, article 5 of the New York Convention of 1958, along with article 46 and 327 of the Moroccan code of civil procedure, grant the competent court enforcing the international arbitration award the authority of monitoring that such award does not contradict the Moroccan or international public system, without meaning that such court turns into a court of cassation in favor of that award".  (*Id.* at 4).

The Moroccan Ambassador explained that the Moroccan appellate court was acting pursuant to the Convention's provision allowing a signatory country to "refuse to enforce an arbitration award that is 'not capable of settlement by arbitration under the law of that country' or if 'the recognition or enforcement of the award would be contrary to the public policy of that country'."  (Letter, ECF No. 20 (quoting New York Convention art. V(2)(a)-(b))).  That

provision is taken from section (2) of article 5, which describes the role of a court in a secondary, not a primary, jurisdiction.  While section (1)(e) states that a "competent authority of the country in which, or under the law of which, that award was made" can set aside or suspend an arbitral award, section 2 describes what a "competent authority in the country where recognition and enforcement is sought" can do or decline to do.  New York Convention art. V(1)(e), (2).  A court in the United States, including this court, could refuse to enforce the award against Morocco if the arbitral award dealt with a subject matter that cannot legally be arbitrated in the United States, or if enforcement of the award would be contrary to the public policy of the United States.  But this court could not set aside the arbitral award.  This court finds the language used by the Moroccan courts and the Ambassador provides further evidence that Morocco is not a primary jurisdiction with the Article V authority to set aside the arbitral award.

### B.  Estoppel, Public policy, Comity, and *res judicata*

Morocco raised several new arguments on reply, which the court is not required to consider.  *See*, *e.g.*, *Flynn v. Veazey Const. Corp.*, 310 F. Supp. 2d 186, 189 (D.D.C. 2004) ("If the movant raises arguments for the first time in his reply to the non-movant's opposition, the [district] court will either ignore those arguments in resolving the motion or provide the non-movant an opportunity to respond to those arguments by granting leave to file a sur-reply."). However, because Petitioner had an opportunity to respond at oral argument, the court will address the new arguments briefly.

Morocco argues that Salini is estopped from disputing Morocco's status as a primary jurisdiction; that the "revenue rule" prevents confirmation of the award from being justiciable in United States courts; and that the principles of comity and *res judicata* require the court to decline to confirm the award.

First, Salini is not estopped from arguing that Morocco does not have the authority to set aside the award because, by bringing a request to confirm the award in Morocco's courts, Salini treated Morocco as a secondary rather than a primary jurisdiction.  Salini's choice to seek confirmation of the award in Morocco does not constitute recognition of Morocco as a primary jurisdiction.

Second, Morocco claims that the award implicates the common-law "revenue rule" which prevents U.S. courts from enforcing a tax judgment of another sovereign.  *See Attorney Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 106 (2d Cir. 2001).  The award here does not involve a tax judgment, but the repayment by Morocco of taxes that were levied against Salini in violation of their contractual agreement.  The revenue rule is implicated in cases where "the main object of the action [i]s the collection of money that would pay foreign tax claims."  *BCB Holdings Ltd.*, 110 F. Supp. 3d at 249 (citing *Pasquantino v. U.S.*, 544 U.S. 349, 364 (2005) (internal quotations omitted)).  Where, as here, "[t]he crux of [a] dispute [i]s contract enforcement rather than the enforcement of a foreign revenue law," the revenue rule does not apply.  *Id.*

Salini did not bring its claim to the arbitral tribunal in an attempt to enforce Morocco's tax laws.  In fact, the arbitral tribunal found it had jurisdiction over Salini's claim to "to secure the reimbursement of the amounts which it had paid or would still have to pay for indirect and direct taxes and duties within Morocco."  (Pet. Ex. D ¶ 25).  The ICC further noted that "the Kingdom of Morocco itself states, subject to the reservations expressed above, that the Arbitral tribunal had jurisdiction to determine whether the Employer undertook, through a provision of the Agreement, to reimburse to the Contractor the indirect and direct taxes for which it demands

compensation." (*Id.*).  The crux of the dispute before the ICC was contract enforcement, not the enforcement of a foreign revenue law.  (*See* Pet. Ex. D ¶ 25).

Morocco's invocation of comity principles and *res judicata* has been effectively rendered moot by the court's conclusions.  While domestic courts have traditionally afforded comity to foreign judgments entitled to recognition, "affording comity to foreign judgments is not mandatory."  *Int'l Trading and Indus. Inv. Co*, 763 F. Supp. 2d at 24.  "[R]ather, comity will be granted to the decision or judgment of a foreign court if it is shown that the foreign court is a court of competent jurisdiction, and that the laws and public policy of the forum state will not be violated."  (*Id.*) (internal citations and quotations omitted).  Here, the courts of Morocco are not courts of "competent jurisdiction" because those courts lack the authority under the New York Convention to set aside or modify the arbitral award.  Thus, not only are the decisions rendered by the Administrative and Administrative Appellate Courts of Rabat not entitled to deference under principles of comity, but any future decision rendered by the Morocco Court of Cassation will not be entitled to this court's deference.  The court is therefore without authority to deny confirmation of the arbitral award under Article V(1)(e).

Neither does *res judicata*, which prohibits parties from relitigating matters that are the subject of a final decision in any court, apply.  *See NRDC v. Thomas*, 838 F.2d 1224, 1235 (D.C. Cir. 1988).  The New York Convention scheme for enforcement of an arbitral award explicitly allows confirmation of an award in multiple jurisdictions.  Because the court has found that Morocco was a secondary and not primary jurisdiction with regards to the Award, *res judicata* does not prohibit Petitioner from seeking confirmation of the Award in the United States.

**IV.      Conclusion**

For the reasons set forth above, Salini's Petition to Recognize, Confirm, and Enforce a Final, Binding Arbitral Award will be **GRANTED** and Morocco's Motion to Dismiss the Petition will be **DENIED**.

A corresponding order will issue separately.

Dated: February 10, 2017

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge